## PEIRSON v. McNEAL.

1. WITNESSES — COMPETENCY — TRANSACTIONS WITH DECEASED PERSON.

> In a suit by an executrix to set aside an assignment of certain mortgages by the deceased to the defendant, the testimony of the defendant as to the delivery of the assignments by the deceased to her is equally within the knowledge of the deceased and inadmissible.   3 Comp. Laws, § 10212.

2. MORTGAGES—ASSIGNMENTS—DELIVERY.

> In an action to set aside assignments of certain mortgages, evidence reviewed, and *held* to sustain a finding that the assignments had been delivered to the assignee prior to the assignor's death.  GRANT, J., dissenting.

3. WITNESSES — COMPETENCY — TRANSACTIONS WITH DECEASED PERSON.

> Where testator devised his entire property to his wife, and appointed her executrix, a suit brought by her as executrix to set aside assignments of certain mortgages on the theory that the mortgages equitably belonged to her, was an action for her personal benefit, and not for the benefit of the estate and hence, she being the real party in interest, was precluded by 3 Comp. Laws, § 10212, from testifying to facts equally within the knowledge of her deceased husband.

4. EXECUTORS AND ADMINISTRATORS—CLAIM OF EQUITABLE LIEN —ISSUES.

> A claim for an equitable lien upon a house and lot for the purchase money or a portion thereof, furnished by complainant in her individual capacity, cannot be litigated in a suit by her as executrix of her husband's will, although her husband purchased the property with her money and took the title in the name of the defendant.

Appeal from Lenawee; Chester, J.   Submitted November 4, 1903.   (Docket No. 78.)   Decided July 16, 1904.

Bill by Harriet A. Peirson, executrix of the last will and · testament of Levi R. Peirson, deceased, against Myrtie M. McNeal, Corvis M. Barre, Chauncey F. Cook, and

others, to set aside a deed and the assignment of certain mortgages. From a decree dismissing the bill, complainant appeals. Affirmed.

*Fellows & Chandler*, for complainant.

*James S. Galloway* and *Thomas E. Barkworth*, for defendants Barre and Cook.

CARPENTER, J. This is a suit in chancery to set aside the transfer of two mortgages from complainant's testator to the first-named defendant. There is also a claim, which will be discussed at the conclusion of this opinion, that complainant, in her individual capacity, is entitled to an equitable lien on certain real estate. The original bill was filed by complainant, the widow of said Levi R. Peirson, deceased, in her individual capacity. It sought relief on the ground that the moneys invested in the mortgages belonged to her. Afterwards the will of said Levi R. Peirson, whereby he devised to complainant all his property and appointed her executrix, was admitted to probate. Thereupon her bill was amended, and a decree sought on the ground that these mortgages still belong to the testator's estate. The trial court dismissed complainant's bill. She appeals to this court, and asks a decree "so that these two mortgages should stand in the name of the estate; then, by operation of the will, they would, after the settlement of the estate, come to Mrs. Peirson."

Complainant contends that she is entitled to this decree on one of two grounds: *First*, that the assignments were never delivered; *second*, that, if they were delivered, no consideration was paid for them, that they equitably belong to complainant, and that they should be decreed to belong to the estate in order that complainant's equitable right to them may be enforced. We will discuss these claims separately.

*First.* Were the assignments ever delivered? One of these assignments was dated September 5, 1898, and the other December 14, 1898. Mr. Peirson died in a hospital

in Columbus, Ohio, January 13, 1899. He had gone to that hospital, accompanied by Miss McNeal, December 19, 1898. The papers were not placed on record until January 16, 1899, three days after Mr. Peirson died. Complainant contends that these assignments were never delivered, and were in Mr. Peirson's possession at the time he died. The trial judge, who heard the witnesses, found against this contention; and in my judgment the evidence that these assignments were delivered just before the deceased and Miss McNeal went to Columbus is convincing. Without considering the testimony of Miss McNeal, which I think is inadmissible under the statute (section 10212, 3 Comp. Laws), we have the testimony of her mother and sister that they saw the papers—not merely the envelope containing them—in her custody in December, 1898. We have the testimony of her cousin, Seth McNeal, an attorney, that Mr. Peirson told him on the 15th of December, 1898, that he had given Myrtie about $7,000 (the aggregate of the mortgages and other property was just about $7,000). We have the testimony of Albert Price that on the 16th of December, 1898, Mr. Peirson told him that he had assigned these two mortgages to Myrtie. It is true that this witness says:

"The impression I got from what he said to me was that he had made these papers—these assignments—and fixed his property over with the intention of it taking effect at his death."

Notwithstanding this statement, I think Mr. Peirson—who was a lawyer, and knew the meaning of the words he used—correctly stated the facts when he told the witness, as the witness testifies, "he had made a disposition of his property; that he had assigned the mortgages to Myrtie." It is conclusively established that Mr. Peirson intended that after his death these mortgages should belong to Miss McNeal. He did not intend to transfer them by a will or any instrument to take effect after his death. He intended to transfer them directly to her by delivery. He was a lawyer, and presumably he knew that, to effect-

uate his intent, this delivery should be made while he was
living.   Nor can it be urged that his sudden death pre-
vented his carrying out his intention.   Before he left for
Columbus, he apprehended death.   It was because of that
apprehension that he desired witness Price to understand
what he had done.   It is difficult to believe that under
such circumstances he omitted to make a delivery of these
papers.   The testimony above referred to is therefore in
entire harmony with the probabilities.

I do not think that the charge should be made that the
testimony of the mother and sister of Miss McNeal was
introduced out of place.   Of course, it was introduced, as
it should have been, after complainant had closed her
testimony in chief.   I do not understand from the record
that it was introduced after complainant had closed her
rebutting testimony.   The notion that it was so introduced
I think results from the fact that complainant swore some
witnesses, who testified to value, just before the testimony
under consideration was introduced, and before defend-
ants had rested.   We are asked to discredit this testimony
because the papers were not recorded until January 16th,
because Mr. Peirson was in control of the subject of the
first assignment on the 12th of November, and because
one witness—Mr. Ransom J. Eaton—testifies to two con-
versations with Miss McNeal in which she admitted to
him that the mortgages were never delivered.   The fact
that these assignments, delivered just before and in antici-
pation of Mr. Peirson's death, were not placed on record
until after his death—an event which occurred in less than
a month after the papers were delivered—is to my mind
a circumstance of no particular significance.   The fact
that Mr. Peirson claimed to be in possession of one of
these mortgages on the 12th of November is entirely con-
sistent with the evidence that he parted with his interest
in that mortgage by delivering, in December, an assign-
ment executed in September.   Miss McNeal denies under
oath that she made the admission to Mr. Eaton, and in
this she is corroborated in part by the testimony of her

cousin, Mr. Seth D. McNeal. We are not compelled to choose between the alternative (*a*) of believing Mr. Eaton, or (*b*) of declaring that he has committed perjury. It is, to my mind, altogether more probable that he is mistaken in his recollection of what Miss McNeal said than it is that the other witnesses were mistaken, and that the trial judge was mistaken in crediting their testimony.

*Second.* Nor do I think that complainant can prevail on the ground that these mortgages are equitably hers. The only testimony in the case which justifies the conclusion that these mortgages equitably belong to complainant is her own testimony. In giving that testimony complainant testified to matters clearly within the knowledge of her testator. On the theory that this property is equitably hers, complainant is seeking a decree, not for the benefit of the estate, but for her own benefit. She attacks the transaction between her testator and Miss McNeal, not on the ground that the testator's estate is damaged, but solely on the ground that her interest in the estate is damaged. It is clear, therefore, that if complainant can recover on the ground that she is the equitable owner of the property, and that her equities entitle the estate to recover what otherwise it could not recover, she is the real party in interest. See *Bachelder* v. *Brown*, 47 Mich. 366 (11 N. W. 200). Complainant is, in the language of the statute (section 10212, 3 Comp. Laws), "the opposite party" to Miss McNeal, who is (see *Ripley* v. *Seligman*, 88 Mich., at page 189 [50 N. W. 143]) an assignee of the deceased. Complainant's testimony is therefore inadmissible under said section. See *Bachelder* v. *Brown*, supra.

I do not understand that complainant asks relief upon the ground that she has established her charge in the bill that these assignments were procured by undue influence. To avoid any misapprehension, we deem it proper to say that, in our judgment, that charge is not established.

We now come to the consideration of the claim referred to at the commencement of this opinion—that complain-

ant, in her individual capacity, is entitled to a lien on certain real estate. In 1896, complainant's husband, Mr. Peirson, purchased a house and lot for Miss McNeal. The title was taken in her name, and she has had the use of the property since that time. It is claimed that all, or at least a portion, of the purchase money belonged to complainant, and for that reason an equitable lien should be declared in her favor. We regard this suit—and in so doing we construe the amended bill as claimed by complainant—as a suit brought by her as executrix of her husband's estate. As such executrix she can obtain relief only for the estate's grievances. She has no right to litigate in such a suit a matter like that now under consideration, in which the estate has no interest. If the claim is well grounded—which we neither affirm nor deny—it should be the subject of a suit brought by her in her individual capacity.

We are not called upon to determine the propriety of the relations which existed between Mr. Peirson and Miss McNeal, for it is clear that the impropriety of those relations, if they were improper, would not, as a matter of law, defeat the latter's title to the mortgages in question.

In my judgment, the decree of the circuit court should be affirmed, with costs.

MOORE, C. J., MONTGOMERY and HOOKER, JJ., concurred with CARPENTER, J.

GRANT, J. (*dissenting*). Complainant and Mr. Peirson were married September 17, 1857. She was then a young widow, possessed of some means, and he was in the mercantile business in Hudson, Mich. He failed in 1859, studied law, and entered upon the practice of the profession at Hudson in 1862. He occupied rooms for his office in a building owned by his wife. His business was small, largely confined to office work. The only data of the extent of his business is found in his account books for the years 1895, 1896, 1897, and 1898. In 1895 it amounted to $1,085.24, and decreased steadily until in 1898 it

amounted to $747.63. In September, 1892, he took into his office as clerk the defendant Myrtie M. McNeal, a young woman then about 22 years of age. She was neither a stenographer nor a typewriter. She had taught district school some, for which she had received $5 per week. She remained in his employ until his death, January 13, 1899. Mr. and Mrs. Peirson had no children. Mr. Peirson died in a hospital in Columbus, Ohio. Miss McNeal was with him. His wife was at her home in Hudson, and remained at her home, evidently by his wish. When he knew that he must die, he did not desire that she should be summoned. On January 16th, after his death, Miss Mc-Neal placed upon record the assignments of two mortgages—one known as the "McCullen mortgage," the assignment being dated and acknowledged September 5, 1898; the other known as the "Duesler mortgage," the assignment of which bears date December 14, 1898. The consideration of the first assignment is "one dollar * * * to me in hand paid by my adopted daughter, Myrtie M. McNeal, * * * and the further consideration of wages owing to her for her past services, and the further consideration of kind acts and faithful and trusty services as clerk in my law office for the years past, and the further consideration that she has agreed to remain in such clerk-ship relations and such services, the same as she has in the past, so long as I live, if she outlives me, party of the second part." The second assignment recites a consideration of "one dollar * * * for valuable services rendered, * * * and further consideration or agreement, by said party of the second part, to remain with me, and assist me in my business so long as I shall live; and in appreciation of her many good qualities and her uniform kindness to me." In 1896 Mr. Peirson purchased a house and lot for Miss McNeal, for which he paid $1,100, and the title was taken in her name, possession given, and she received the use of it from that time. Soon after the death of Mr. Peirson, Mrs. Peirson learned of the assignments of these mortgages, and thereupon, on January 25th, filed the origi-

nal bill of complaint to set aside these assignments and the deed. Notice of lis pendens was duly filed the following morning. On January 25, 1899, Miss McNeal assigned these mortgages to the defendant Barre, and on the following day he assigned them to the defendant Cook. The amount of principal and interest was then $5,478. Upon learning of these assignments, the complainant amended her bill by permission of the court, making Barre and Cook defendants. Mr. Peirson left a will, which was subsequently admitted to probate, and by his will his wife was made the sole legatee and executrix. Her amended bill was filed in her name as executrix. Answers were duly filed, proofs taken, and complainant's bill dismissed. Further statement of the facts, so far as essential, will be made in connection with the points discussed.

1. The original bill was filed by complainant in her individual capacity, alleging in brief that Mr. Peirson had taken and used her money and property, had received all the rents and profits of the building in Hudson owned by her, and in which he had an office, without having paid any rent; that he had rendered no account of the same; that in 1865 they made mutual wills in settlement of their property affairs, by which she left all her property to him should she die first, and he left all his property to her should he die first; and that the moneys invested in these mortgages and land were hers, and in equity belonged to her. The amended bill filed by her as executrix is upon the theory that these mortgages belong to Mr. Peirson's estate, that the assignments were void, that neither the assignments nor the mortgages were ever delivered to Miss McNeal, that she had been fully paid for her services, and that the deed and assignments were obtained through undue influence. It is urged on behalf of the defense that the amended bill cannot be maintained, for the reason that this is in fact a contest between Mrs. Peirson and Miss McNeal as to the validity of the transfers to the latter, and that that is the theory of the amended as well as the original bill. I cannot concur in this view. The notes and

mortgages collateral to them were personal property, and
the title thereto was in Mr. Peirson's estate.   An admin-
istration was necessary before they could be distributed
under the will and title thereto pass to his heirs or lega-
tees.   His executrix was therefore the proper party to test
the validity of these transfers.   Should they be set aside,
the property then passes to the estate (1) to pay the debts,
and (2) to be distributed under the will.   I am there-
fore constrained to hold that the amended bill is properly
planted by the executrix.   The suit then becomes one by
the estate against the defendants, and the testimony of
Miss McNeal as to her arrangements with Mr. Peirson,
the deceased, is inadmissible under the statute.

2.  Aside from the fact of the assignments and the deed,
her case depends almost entirely upon her own testimony.
It is unnecessary to fully enter into the details of the re-
lations existing between Mr. Peirson and Miss McNeal.
The conclusion I have reached is that soon after she
entered into his services he transferred his affections from
his wife to her.   He was infatuated with her, and evi-
dently she had great control over him.   Soon after she
entered the office he furnished a back room, which had been
before used only as a storeroom, with carpet, bed lounge,
furniture, and liquors.   In 1897 he took her to Massachu-
setts, leaving his wife at home.   She went to Adrian the
day before, and met him upon the train the next day.   In
Massachusetts he introduced her as his adopted daughter.
Mr. Peirson once took into his office a young attorney,
without pay, to study, and assist him some in his business.
Miss McNeal left the office in a few days, and refused to
return until the young man was discharged, although it
is not claimed that he was guilty of any impropriety
towards her.   Mr. Peirson apologized to the young man,
and explained that he could not get along without Miss
McNeal, and the young attorney was promptly discharged.
That he paid her for her services promptly is not denied.
Her only claim is that he promised to do something for
her at his death, and that, therefore, she worked for small

wages. The disinterested testimony is that Mr. Peirson paid her every week, and that she told one disinterested witness that he paid her $10 a week. According to her own testimony, she was no more to him than a clerk; and yet, under her own figures, she is to receive, if these assignments be sustained, the sum of $7,237 for a little more than six years' work. And according to the testimony on the part of complainant she will receive $9,872. At the hospital in Columbus, shortly before he died, he said to his nurse, "I couldn't live without my Myrtie," and when asked by the nurse if he did not wish to see his wife, he replied, "No." When he went to Columbus, in December, Miss McNeal, by previous arrangement, went to Adrian the day before, and met him on the train. At the hospital he introduced her as his daughter, and while she was there she was recognized by all as Miss Peirson, and signed her name as Miss Peirson. They occupied adjoining rooms, with folding doors between. Human nature will permit of but one conclusion when a man leaves his wife at home and travels with his female typewriter, introducing her as his daughter. Service rendered by her in a financial way cannot account for the transfer of this large amount of property to her. It can only be accounted for upon the existence of improper relations, and the facts justify such a conclusion, and no other. This brings us to the question, Were these notes, mortgages, and assignments delivered to Miss McNeal? Neither was delivered when it was signed and acknowledged. No one was present when it is claimed they were delivered, except Miss McNeal and Mr. Peirson. Miss McNeal's mouth is closed by the death of Mr. Peirson. With her testimony excluded, the only evidence of delivery is the fact that the papers were in her possession after his death, and the testimony of her cousin and attorney, Seth McNeal, her sister, and her mother. Seth McNeal testified that he saw the mortgages on the Sunday afternoon after the return from Columbus; that Myrtie gave the key to him, and he went to her room and

got the mortgages. The mother testified that a short time before Miss McNeal went to Columbus she brought home some papers, laid them on the stand, afterwards went up-stairs, put them in the drawer, gave the key to her sister, Nellie, and told her to take care of them. "She didn't say what they were; only that they were valuable papers." She further testified that she saw them at Christmas, and looked at them a little. On cross-examination she testified:

"All I know about it is that Myrtie brought in some papers, left them on the stand, and said they were valu-able papers. She didn't say what they were, or where she got them, or anything about them. She left them there until she retired that night, and took them upstairs and locked them up. That is all I know about it. I had one in my hands—the Duesler mortgage. I just took it up and looked at it, and just saw Julia Duesler's name."

Her sister testified that Miss McNeal brought some papers home a few days before she went to Columbus; said nothing as to what they were; that when she went to Columbus she gave witness the key, and told her to take care of them while she was gone; that there were two envelopes; that the writing on them said they were mortgages. Both witnesses identified the envelopes, and the witness Nellie testified that she "took the papers out to see what the envelopes contained," but when she did this does not clearly appear. Opposed to this is the testi-mony of one Ransom J. Eaton, who was a personal and life-long friend of Mr. Peirson. Mr. Eaton was an under-taker, and Mr. Peirson had expressed to him a wish that when he died he should take charge of his funeral. After Miss McNeal had been in the hospital some days with Mr. Peirson at Columbus, she returned home to Hudson. Meanwhile Mr. Peirson became worse, and was evidently nearing the end of life. Mrs. Peirson received a telegram from Dr. S. P. Hartman, superintendent of the hospital, directed to Miss M. Peirson, saying: "Your father grow-ing weaker rapidly. Come to him at once." Mrs. Peir-

son sent this telegram to Mr. Eaton. Mr. Eaton went to Mr. Peirson's office, where he found Miss McNeal, and told her that he was going down after Mr. Peirson, and would like to know what shape Mr. Peirson's things were in down there. He testified that she told him:

"There was money and valuable papers in the trunk, and that she was pretty busy just then, and that she wished I would make up my mind to go. She said she wished I would go. She said there was something like six hundred dollars and valuable papers. At that time she did not tell me whose they were. I said, ' I will see Mrs. Peirson, and, if she is willing I should go, I will see you again in this matter, and let you know.' She said, ' Very good.' At that time she didn't make any claim that these valuable papers were hers."

After this interview Mr. Eaton went to see Mrs. Peirson, who would not consent to his going, because it was unseemly to send an undertaker there before he was dead. Thursday morning following Mr. Eaton again saw Miss McNeal, and she said to him:

" That there were $300 she had deposited with Dr. Hartman, and she said in the trunk there was a couple of mortgages that belonged to her that had never been delivered. She wished that I would go down there myself and see to it, and get those and give them to her. She said she felt that somebody ought to be there to look after them, and it was too bad to see Mr. Peirson die in that way, and it was too bad to see this money and papers going that way, and she wished I would go. I said, ' Myrtie, can't you go ?' She said, 'No, I cannot.' This was about nine o'clock."

Miss McNeal admits having had conversations at these times with Mr. Eaton; denies the material facts testified to by him, but admits the immaterial. At 2:20 that afternoon Miss McNeal, accompanied by Seth McNeal, her cousin and attorney, left for Columbus. They arrived at the hospital during the night; but Mr. Peirson was unconscious, and so remained until his death, the next morning. On receiving a telegram of his death, Mr. Eaton left for

Columbus, arriving there about 9 o'clock Friday night. He went to the hospital the next morning, and found Miss McNeal and her cousin there. She had possession of Mr. Peirson's effects. A question arose about turning them over to Mr. Eaton upon a written order from Mrs. Peirson, which he had. After a consultation between Miss McNeal and her attorney, she consented to turn them over. Upon doing so, Mr. Eaton testified:

"She said, 'That is all, except those two mortgages or bequests that I told you about in Hudson, which had not been delivered to me; but,' she said, 'those I cannot give you. They are mine.'"

Mr. Eaton is an entirely disinterested witness. There is no room to say that he is mistaken. Either Miss McNeal said what Mr. Eaton testified to, or else he is a perjurer. No motive can be found for his committing the crime of perjury. It follows that, if his testimony is believed, these mortgages and assignments were not delivered.

It is also a matter of some significance that the sister and mother were not called as witnesses until about the close of a long hearing, after the complainant had closed her testimony in chief, the defendants had closed their testimony in chief, and the complainant had closed her rebuttal. It could not well have escaped the attention of Miss McNeal and her counsel that it was essential for her to prove actual delivery. The facts testified to by her mother and sister, and their importance, must have been known to her, if not to her counsel. It is, in my judgment, much more reasonable to say that the mother and sister were mistaken as to the time when they saw these papers in the possession of Myrtie than to say that Mr. Eaton was mistaken, or had testified falsely.

But there are other indicia of nondelivery. They were not recorded during Mr. Peirson's lifetime, but were promptly recorded after his death, being put upon record the very day of the funeral, upon the return of Miss McNeal from Columbus. No reason is shown or suggested

why, if delivered, she should not have placed them at once upon record.

On November 12—more than two months after the date and acknowledgment of the assignment of the McCullen mortgage—Mr. Peirson wrote to Mr. McCullen, stating that there would be $141 interest due February 1, 1899, and offering to take $100 if he would pay the interest in full up to that date, and to make him and his wife a present of the $41, and that he would then have no more interest to pay until February 1, 1900. Nothing was said in the letter about having assigned the mortgage. Mr. McCullen afterwards called on Mr. Peirson, and in a conversation Mr. Peirson said that "he intended to give her [Miss McNeal] that property, if nothing happened, when he died." Mr. Duesler testified to a conversation with Mr. Peirson a few days—not over 10—before Mr. Peirson went to Columbus. Mr. Duesler then paid Mr. Peirson the interest due on the mortgage. Mr. Duesler testified that Mr. Peirson said "he had transferred, or was going to transfer, the mortgage to her [Miss McNeal], and for us to deal with her as with him, after he was dead." On cross-examination he testified:

"It is my best recollection that Mr. Peirson said we should deal with her after his death. It is my recollection those are the very words."

Miss McNeal did not notify either of the mortgagors that she owned, or claimed to own, either mortgage, until after Mr. Peirson's death. According to the testimony of one Albert Price, a witness for the defendants, Mr. Peirson, anticipating trouble after his death, called Mr. Price into his office December 16, 1898, to talk with him, and have him observe his mental condition. In this conversation Mr. Peirson told Mr. Price that he wanted to do something for Miss McNeal, and spoke about the mortgages he had assigned to her. Mr. Price testified:

"He didn't tell me that he had delivered any papers, or anything of the kind, but he was making calculations, in

case he should go away, or should die, to leave these papers in this shape.    *    *    *    My impression that I got from what he said to me was that he had made these assignments, and fixed his property over with the intention of taking effect at his death."

He further testified that he inferred from the conversation that he had not passed any of the papers over to Miss McNeal. That he did not intend to deliver them at the time he signed and acknowledged them is apparent from the fact that he did not then deliver them, and that he retained them, under the testimony of her own witnesses, until just before he left his home for Columbus. It is, in my judgment, entirely consistent with the character and actions of Mr. Peirson, as delineated upon this record, to hold that he did not intend to part with these mortgages and the income therefrom so long as there was any possibility that he would live to control and use them. I think he took them with him to Columbus, intending to deliver them to Miss McNeal whenever he should think death was approaching. I prefer to believe the disinterested testimony of Mr. Eaton, sustained as it is by circumstances, rather than the interested testimony of Miss McNeal's mother, sister, and cousin. I therefore conclude that these mortgages and assignments were never delivered. He left them undelivered in his trunk, and she took them without any authority or right. In doing so she obtained no title.

3. Were the defendants Barre and Cook bona fide holders? Both received the Duesler note and mortgage and the assignment after they became due. They therefore took no better title than their transferror, Miss McNeal, had. 1 Dan. on Negot. Inst. § 782; *Fisher* v. *Leland*, 4 Cush. 456 (50 Am. Dec. 805). In that case Chief Justice Shaw said:

" Where a negotiable note is found in circulation after it is due, it carries suspicion on the face of it.    *    *    *    Although it does not give the indorser notice of any specific matter of defense, such as set-off, payment, or *fraudulent acquisition*, yet it puts him on inquiry."

Tiedeman says:

"It can also be shown against the indorsee of overdue paper that he claims title through a thief or finder, or from a bankrupt." Tiedeman on Com. Pap. § 295.

It follows that defendants Barre and Cook obtained no title to this note and mortgage, and that the title thereto is in the estate. They are therefore payable to complainant as executrix of her husband's will.

4. Was Mr. Barre a bona fide holder of the McCullen mortgage, which was not then due? Miss McNeal and her cousin anticipated that the title to these notes and mortgages would be contested, and therefore determined to dispose of them, and place them, if possible, beyond the reach of complainant. She testified, " I was afraid of being sued, and I sold them to get them out of my hands." They evidently did not consider it safe to attempt to negotiate them in Hudson, and therefore went to Hillsdale on the 25th of January, with a view to dispose of them. Mr. McNeal had talked with Mr. Barre the day before in regard to them. The two went to Mr. Barre's office, and, according to their testimony, she at once offered them to him for $4,000. He offered $3,500. They compromised upon $3,750, a discount of about $1,700. Mr. Barre left his check for this amount with his partner, with the understanding that he (Mr. Barre) should go to Adrian, the county seat, examine the title and assignments, and if he found everything satisfactory, he was to telephone that he would take them, or go back on the fast mail late in the afternoon. He went to Adrian, examined the title and assignments, and telephoned his partner to give the check and take the papers. Mr. Barre had no money in bank to meet the check, but, as he testified, expected to hypothecate other mortgages of his own in order to raise the money. Miss McNeal did not get the check cashed, and on the following day, according to agreement, went with her cousin to Mr. Barre's office in Hillsdale. Mr. Barre went to the office of Mr. Galloway, an attorney, and of-

fered the mortgages to him.   Mr. Galloway said Mr.
Cook wanted, or would buy, some mortgages.   Mr. Barre
and Mr. Galloway spent nearly the whole forenoon, ac-
cording to Mr. Galloway's testimony, in examining the
abstract and the assignments.   As Mr. Cook was passing
the office of Mr. Galloway, they called him in.   Mr. Cook
knew nothing of the value of the lands or the responsi-
bility of the mortgagors, but told Mr. Galloway that if
he said they were all right he would take them.   Mr.
Barre offered a discount of $150, saying that he got some
little discount himself.   Mr. Barre's check was never
cashed.   It was surrendered to him, and Miss McNeal
was paid out of the moneys received by Barre from Cook.
Under these conditions Mr. Cook paid $5,328 to Mr.
Barre, and out of the amount due her he (Barre) retained
$500, as he testified, "for the purpose of securing her at-
tendance as a witness in the case."   The sale and trans-
fer to Mr. Barre were not consummated until he paid the
money to Miss McNeal late in the afternoon of the 26th,
and of course not until after or at the same time the trans-
fer from Barre to Cook was made and the money paid, for
he paid her with the money received from Cook.   Mean-
while the bill in this case and notice lis pendens had been
filed.   Mr. Barre knew of the relations existing between
Miss McNeal and Mr. Peirson.   These relations had been
fully exposed in a lawsuit in which Mr. Peirson and Miss
McNeal were witnesses and Mr. Barre an attorney.   He
had examined the assignments of Peirson to Miss McNeal.
He testified that he knew that these securities were "gilt-
edged," and that such securities were much in demand at
their face value, they bearing 6 per cent.   The parties
were attempting to negotiate them among strangers, and
away from the home of the makers, payee, and assignee.
Simultaneous with his purchase he sold them at a discount
of $150.   It is a just inference that he did not wish to re-
tain in himself the title to these gilt-edged investments.
An offer to sell gilt-edged commercial paper at two-thirds
its actual value is sufficient to put a man upon inquiry.

" The price at which the paper is offered may amount prima facie to notice, and create the presumption of bad faith in the purchaser. If a person were to offer a fine horse for sale for five cents, the very nature of the offer would warn the purchaser that he acted at his peril. And so, if the amount which the holder offers to take for a negotiable instrument is totally insignificant as compared to its face value, it might be, under the circumstances, implied notice that there was something wrong about it; and if he took it without inquiry he should not be protected. There is no conflict between this view and the cases which hold that gross negligence will not of itself be sufficient to impeach the holder's or purchaser's title. This is not merely gross negligence, but may be regarded as willful or fraudulent blindness, and abstinence from inquiry, so great as to amount to evidence of bad faith. For it is the obvious suggestion of reason that a bona fide owner would not throw away his property for a mere song, and that the purchaser acted in bad faith when he acquired it for comparatively nothing." 1 Dan. Negot. Inst. § 777*a*.

In *Strong* v. *Jackson*, 123 Mass. 60 (25 Am. Rep. 19), a note and mortgage were assigned to one Jackson as collateral security for the note of one Kingsley to enable him to borrow money from Jackson. The note and mortgage and Kingsley's note were delivered to Jackson. Jackson assigned the mortgage to one bank to secure a debt of his own. He subsequently transferred the note to which the mortgage was collateral to another bank as collateral security for a loan made by him at that bank. It was held that the taker of either the mortgage or the note took according to the true title of the one who transferred it, and that, therefore, the second bank took no title, and did not take the note in the ordinary course of business without notice.

In *Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191 (25 N. E. 402, 10 L. R. A. 676), the plaintiff bank took two notes of $1,000 each, made by a farmer living six miles from the bank, from a stranger, at a discount greater than the lawful interest. The bank made no inquiries, but "studiously refrained from acquiring any information as to the circumstances under which such an

indebtedness was incurred." The notes were obtained by fraud from the defendant. The court held that the notes could not be said, as a matter of law, to have been acquired in good faith and in the "usual course of business," and the question was properly left to the jury.

In *Smith* v. *Jansen*, 12 Neb. 125 (10 N. W. 537, 41 Am. Rep. 761), plaintiff purchased notes aggregating $100 for $30. It was held that he was not a bona fide purchaser, and did not take the paper in the usual course of trade.

In *Hall* v. *Wilson*, 16 Barb. 548, an employé stole a promissory note, made by his employer, for $120, payable to U. or bearer, intending to subsequently deliver it upon obtaining the money. It was placed by the maker in his desk, whence it was stolen. The employé sold it to one Bigelow for $115. Before it became due, Bigelow transferred it to plaintiff. It was held that the plaintiff could not recover, the note never having had a legal inception for want of delivery, and not having been taken for a full and fair consideration and in the usual course of business.

Where a note and mortgage were given by a father for $3,000 to lawyers to defend his two sons charged with murder, and the lawyers transferred the note and mortgage to a third party, who brought suit, and the purchaser knew that the sons had been arrested on the charge of murder, that the attorneys had appeared at the preliminary hearing, that they were not indicted, and that the note was executed while they were in jail, it was held that the circumstances were sufficient to put the purchaser of the note and mortgage upon inquiry as to the consideration. *Shirk* v. *Neible*, 156 Ind. 66 (59 N. E. 281).

So, where a bank purchased the notes of farmers from a stranger at a large discount, it was held that the circumstances were sufficient to put the purchaser upon inquiry as to the validity of the notes. *Auten* v. *Gruner*, 90 Ill. 300; Eaton & Gilbert on Com. Pap. 370. See, also, *Wisconsin Yearly Meeting of Freewill Baptists* v. *Babler*, 115 Wis. 289 (91 N. W. 678).

"Guilty knowledge and willful ignorance alike involve the result of bad faith." *Murray* v. *Lardner*, 2 Wall. 121.

"Bad faith is predicated upon a variety of circumstances; some of them slight in character, and others of more significance.   *   *   *   A perfectly upright, honest man might sell a bond which had been stolen, and the explanation might prevent even the taint of wrong on his part, while the explanation, although falling far short of proof of actual guilt, might leave upon the mind an apprehension that he either directly or impliedly connived at the wrong, or, at least, that he was willing to deal in securities and keep his eyes and ears closed so that he should not ascertain the real truth." *Dutchess County Mut. Ins. Co.* v. *Hachfield*, 73 N. Y. 228.

Where a note is lost or stolen, or fraudulently put into circulation, plaintiff must show that he came lawfully and fairly by it. *Vallett* v. *Parker*, 6 Wend. 615.

It is often difficult to obtain positive evidence of bad faith. The bona fides of the transaction must be determined from the circumstances surrounding each particular case. *Goodrich* v. *McDonald*, 77 Mich. 486 (43 N. W. 1019). There is no uncertainty in the law. The difficulty lies, solely in applying the facts to the law. I am of opinion that Mr. Barre had sufficient knowledge of the transaction to place him beyond the pale of a bona fide holder of this note and mortgage, and is liable to the estate for the amount thereof.

5. Was Mr. Cook a bona fide purchaser and holder of this mortgage?

"A bona fide holder for value of negotiable paper is one who has acquired title in the usual course of business, for a valuable consideration, in good faith, from one capable of transferring it, or from one in possession of the paper with an apparent right to transfer it, and without notice or knowledge of defenses or circumstances which should put him on inquiry." 7 Cyc. 924.

The above is a good general definition of the term "bona fide holder for value." The authorities are there well collated.

It is a well-established rule both in England and America that where one purchases for valuable consideration commercial paper in the usual course of trade, transferable by delivery and not due, which has been lost or stolen or fraudulently transferred, he acquires complete title thereto. 2 Parsons on Notes & Bills, 279; 7 Albany L. J. 385; *Kuhns* v. *Gettysburg Nat. Bank*, 68 Pa. St. 445; *Davis* v. *Seeley*, 71 Mich. 209 (38 N. W. 901); *Chapman* v. *Remington*, 80 Mich. 552 (46 N. W. 34); *Goodrich* v. *McDonald*, supra. Mr. Cook was a banker and investor. Mr. Galloway was his attorney. There is no evidence tending to show that either had any actual knowledge of the relation that had existed between Mr. Peirson and Miss McNeal, or that she had in fact acquired no title to the note and mortgage by reason of nondelivery. Gross negligence may be itself evidence of bad faith, but is not of itself bad faith, nor sufficient to defeat the title to commercial paper where one has paid full and valuable consideration therefor. Had Mr. Cook knowledge of the language of the assignment from Peirson to Miss McNeal, this alone would not have been sufficient to justify the conclusion that he acted in bad faith in the purchase of the paper. The title to the paper did not depend upon Miss McNeal's performing her agreement as to future service. *Kinkel* v. *Harper*, 7 Colo. App. 45 (42 Pac. 173). If Mr. Peirson had executed these assignments by actual delivery, and Miss McNeal had transferred them to a bona fide holder, Mr. Peirson's only remedy would have been an action upon her contract for a breach thereof. I am therefore constrained to hold that Mr. Cook was a bona fide holder, and obtained full title to the Mc-Cullen note and mortgage.

6. The circuit judge dismissed the bill as to the deed on the ground of laches on the part of the complainant. I do not think she was guilty of laches. The ground of the ruling is that she should have commenced her action before. I do not think she was under obligation to precipitate a conflict during her husband's life, or to increase

her domestic unhappiness by instituting suit. No one has been prejudiced by the delay; on the contrary, the defendant McNeal has gained by it, because she had the use of the property. The consideration for the deed given by Mrs. Sharr, as grantor, to Miss McNeal, was paid by Mr. Peirson, who gave his check to Mrs. Sharr for $552.78. The balance was paid in cash, furnished by Mr. Peirson to Miss McNeal. The money so paid was unquestionably received on a mortgage owned by Mrs. Peirson, which Mr. Peirson persuaded her to assign. The assignee of the mortgage paid the money to Mr. Peirson. He turned it over to Miss McNeal to take to the bank. It was never deposited. The estate of Mr. Peirson is not interested in the money which Mr. Peirson thus misappropriated. If it be granted that the money was a gift, Mr. Peirson could not have repudiated it for that reason. He had a right to give away his own property. We do not think the record establishes the fact that the check drawn by him was not drawn upon his own individual funds. If complainant has any lien upon the land because her money was fraudulently used in making the purchase, that is a matter which affects complainant individually, and does not authorize her to maintain a suit in the name of the estate to set the deed aside.

Decree should be reversed, and decree entered in this court for the complainant in accordance with this opinion, with costs of both courts.